# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

      Plaintiff,

vs.                                                                   No. CR 05-469 JB

EDUARDO HERNANDEZ-MEJIA,

      Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on the Defendant's Objections to Presentence Report and Guideline Calculation, filed July 9, 2008 (Doc. 475)("Objections").  The Court held sentencing hearings on June 25, 2008, and July 24, 2008.  The primary issues are: (i) whether the Defendant, Eduardo Hernandez-Mejia, possessed a firearm within the meaning of U.S.S.G. § 2D1.1(b)(1); (ii) whether the evidence presented at trial shows that Hernandez-Mejia was an organizer or leader, as defined in § 3B1.1(a); and (iii) whether a criminal-history category of II over-represents Hernandez-Mejia's criminal history.  Because the Court concludes that Hernandez-Mejia possessed a firearm during the course of a narcotics conspiracy and has not shown that it was clearly improbable that it was connected to that offense, and because the Court concludes that a criminal-history category of II accurately represents his criminal history, the Court will overrule those objections.  The Court agrees, however, with Hernandez-Mejia that the evidence does not show that he was an organizer or leader of the drug conspiracy.  He did, however, act as a manager or supervisor.  The Court will therefore sustain Hernandez-Mejia's second objection in part.

**FACTUAL BACKGROUND**

The facts detailed here are drawn from the evidence presented at trial. The jury convicted Hernandez-Mejia on all but one count, which the Court instructed the jury not to consider,[1] and so the Court construes the evidence in the light most favorable to the United States. See United States v. Lake, 472 F.3d 1247, 1251 (10th Cir. 2007)(reviewing facts in light most favorable to the jury's verdict).

Hernandez-Mejia was involved in a conspiracy to distribute cocaine and heroin in New Mexico. The conspiracy was uncovered through a Drug Enforcement Administration ("DEA") investigation. Initially, the investigation focused on Joaquin Coroneles. See Transcript of Trial Day One at 186:2-9 (taken April 7, 2008)(Martinez & Mata)("I Trial Tr.").[2] DEA agents were looking to identify Coroneles' supplier and, using a confidential informant named Pepe, sought to negotiate a heroin deal through Coroneles. See id. at 190:11-191:7. After Pepe arranged a drug deal with Coroneles, agents used a wiretap to overhear calls Coroneles made to Hernandez-Mejia. See id. at 212:1-21, 221:10-222:1. The agents were attempting to arrange the purchase of 10 ounces of heroin. The calls between Coroneles and Hernandez-Mejia used the phrase "10 dollars of gasoline," id. at 216:3-8 (Martinez), which, based on conversations with co-conspirators, was code for 10 ounces of heroin, see Transcript of Trial Day Two at 153:22-154:18 (taken April 8, 2008)(Martinez & Delgado)("II Trial Tr."). A successful buy of 10 ounces of heroin from Coroneles was made in

---

[1] The count the Court instructed the jury to disregard was a single count of using a telephone to facilitate the drug-trafficking conspiracy. No recording of the relevant conversation was introduced into evidence. See Transcript of Trial Day Four at 201:17-203:8 (taken April 10, 2008)(Court, Martinez & Gomez)("IV Trial Tr.").

[2] The Court's citations to the transcript of the trial refer to the Court Reporter's original, unedited version. Any final transcript may contain slightly different page and/or line numbers.

a Home Depot parking lot on September 17, 2004.  See I Trial Tr. at 221:18-226:20 (Martinez & Mata).  After the transaction, Hernandez-Mejia and Coroneles spoke on the telephone again.  See id. at 229:1-231:5.  Given the code words used, the timing of the calls, and the successful deal, the agents determined that Hernandez-Mejia was supplying heroin to Coroneles.  See id. at 231:7-11.

The testimony of DEA agent Marcus West also supports Hernandez-Mejia being Coroneles' supplier.  West conducted surveillance of Coroneles' house on September 17, 2004, and observed Hernandez-Mejia drive up to the house.  Hernandez-Mejia was on the telephone with Coroneles, and then disappeared briefly from West's sight by moving around the corner of the house.  When he reappeared and drove off, West followed him to a Wal-Mart.  See Transcript of Trial Day Three at 128:2-132:7 (taken April 9, 2008)(Martinez & West)("III Trial Tr.").  Hernandez-Mejia drove slowly and aimlessly through the Wal-Mart parking lot, to a nearby Carl's Jr.'s, back to the Wal-Mart, back to Carl's Jr.'s, and finally back to Wal-Mart, which West thought indicated a "heat run," i.e., an attempt to lose or identify any law enforcement that might be tailing him.  See id. at 132:9-133:10.  The license plate on Hernandez-Mejia's car had been switched out and was not his normal license plate, but rather was a different plate that did not lead back to Hernandez-Mejia -- a common practice of dealers when doing drug deals in public areas.  See id. at 133:24-134:15.

After these incidents, agents began surveillance of Hernandez-Mejia's Los Lunas residence.  A wiretap interception revealed that someone was coming by and that Hernandez-Mejia was going to send him away "with three."  I Trial Tr. at 239:7-18 (Martinez & Mata).  On October 19, 2004, Jose Montoya showed up at Hernandez-Montoya's house.  He was followed as he left the house, and observed, by air and ground, as he made stops at a residence, an Arby's, and a gas station before heading south towards the Mexican border.  See II Trial Tr. at 30:8-32:24 (Martinez & Mata).  Concerned with maintaining the secrecy of the investigation, the federal agents contacted state

police officers and asked them to make a traffic stop of the car, based on the police's own development of probable cause.  See id. at 32:4-15.

Nathan Barton, a former state policeman, testified that he received a call from dispatch on October 19, 2004, to conduct a "whisper stop" for the DEA.[3]  III Trial Tr. at 57:14-58:13.  He pulled over for speeding a car that matched the description and license plate number received from the DEA.  See id. at 58:16-59:9.  A consensual search of the car turned up large amounts of currency under the passenger's and driver's seats.  See id. at 65:9-20.  DEA agent Joe Mata testified that he and other federal agents met up with the state police in Soccorro, and were given $33,000.00 in cash that was taken from the car.  See II Trial Tr. at 35:7-24, 36:14-22 (Martinez & Mata).  A K-9 police dog alerted to the cash, indicating traces of narcotics.  See id. at  37:2-15.

One of Hernandez-Mejia's co-conspirators was Sergio Delgado.  Delgado said that his cousin, Randy Corral, took him to meet with Hernandez-Mejia about selling drugs.  See id. at 138:9-139:25 (Martinez & Delgado).  Delgado began selling drugs for Hernandez-Mejia.  For example, he had a conversation in which Hernandez-Mejia instructed him to sell ten ounces of heroin at six hundred dollars an ounce in return for a "gift" -- a small bag of cocaine.  Id. at 151:1-22.  On other occasions, Hernandez-Mejia had thirty ounces of heroin for Delgado to sell, see id. at 152:25-153:13, or ten ounces of "gasoline," which was code for heroin, see id. at 153:22-154:18.  On at least one occasion, Hernandez-Mejia came to Delgado's house to drop off heroin.  See id. at 155:23-157:6.

Another co-conspirator, Alex Rael, testified that he once purchased twenty-seven grams of cocaine from Hernandez-Mejia to use and share with his friends.  See III Trial Tr. at 74:13-75:3

---

[3] A whisper stop is where law enforcement officers stop a vehicle, but disguise that the stop is anything other than a routine traffic stop.

(Martinez & Rael).  In calls recorded on November 8 and 22, 2004, between Rael and Hernandez-Mejia, Hernandez-Mejia referred to "roosters," which Rael testified meant cocaine.  See id. at 76:1-8, 76:25-77:11.  During the November 22, 2004 call, Rael and Hernandez-Mejia agreed to meet at a Chevron gas station near I-25 and Isleta.  See id. at 75:10-21.  At the gas station, Hernandez-Mejia placed an ounce of cocaine in Rael's truck, Rael gave him $200.00, and they then both drove off.  See id. at 82:12-25.  Sheriff's deputies pulled Rael over and found the cocaine in the first-aid kit on his truck.  See id. at 84:4-85:2.  West had been conducting surveillance on Hernandez-Mejia and had contacted the Bernalillo County Sheriff's Department, asking its officers to pull over Rael if they could develop independent probable cause.  See id. at 169:8-170:11 (Martinez & West).

In addition to being involved in distributing drugs, Hernandez-Mejia was also sending money to Mexico.  Once, he attempted to transfer over $1000.00 at Lino Mini Mart in Los Lunas, but the store owner, Martin Lino, had him call AFEX -- the company operating the money-transmitting service available at Lino Mini Mart -- who told Hernandez-Mejia he would need to photocopy his ID, and the transaction was never completed.  See id. at 40:10-41:5 (Martinez & Lino).  Another time, Hernandez-Mejia sent money in the name of Anthony Barela.  See id. at 41:6-17.  On a number of other occasions $960.00 -- slightly under the $1,000.00 limit, which required more documentation -- was transferred to Martha Guadalupe Sasueta-Bastida in Mexico from the Lino Mini Mart, under various names that Hernandez-Mejia was using.  See id. at 43:1-25,  45:9-48:14.

Richard Rodriguez, the global compliance officer for AFEX, testified about AFEX's anti-money laundering policies.  AFEX policy required people seeking to transmit more than $10,000.00 to provide identification and documentation regarding the source of the funds, and to file a currency-transaction report.  See id. at 26:18-24 (Martinez & Rodriguez).  AFEX also had different policies

in place triggered by lesser amounts, down to its most minimal requirements for those seeking to transmit less than $1000.00, which required information but no supporting documentation. See id. at 26:25-28:10.

A follow-up investigation by Federal Bureau of Investigation agent Deborah Michaels discovered numerous transfers of less than $1000.00 made to Sasueta-Bastida in Mexico, and then to Mario Garcia-Duran in Mexico starting in November of 2004, all from either the Lino Mini Mart in Los Lunas or from Brenda's Fashions in Bosque Farms, New Mexico. Many of the transfers coincided with telephone calls that Hernandez-Mejia made about "sending" under various names, and the transfers generally listed Hernandez-Mejia's address as the sender's address. See IV Trial Tr. at 52:6-56:5, 63:17-73:13 (Martinez & Michaels). The transfers were apparently switched from Sasueta-Bastida to Garcia-Dunn because Hernandez-Mejia became aware of an investigation about why so much money was being sent to Sasueta-Bastida. See id. at 56:18-57:18.

On March 17, 2005, federal agents apprehended most of the members of the conspiracy in a coordinated series of arrests. Tymothy Burkey, a FBI agent, testified that a search of Mariano Falcon's residence on March 17, 2005, revealed approximately $8400.00 in cash hidden under a drawer in a dresser and a firearm under a sofa in the living room. See III Trial Tr. at 192:6-193:20 (Gomez & Burkey). FBI agent Steven Hale testified that a search of Durango Electronics, Falcon's business, on March 17, 2005, revealed two packages of several brown balls that agents suspected were drugs in a rear storage room. See id. at 195:17-202:14 (Gomez & Hale). FBI agent Leroy Chavez testified to the search of Hernandez-Mejia's house in Los Lunas on March 17, 2005, in which a loaded firearm was discovered on the floor of one of the bedrooms. See id. at 212:6-14, 214:2-5 (Gomez & Chavez). The search also turned up a digital scale, see id. at 220:22-25, and a book containing the names and phone numbers of Montoya, Delgado, Coroneles, Falcon, Sasueta-

Bastida, and others, see id. at 219:18-22; IV Trial Tr. at 74:7-78:22 (Martinez & Michaels). Laboratory analysis determined that the brown balls that agents seized from Durango Electronics contained 334 grams (approximately 13 ounces) of heroin.  See IV Trial Tr. at 16:13-17:4 (Gomez & Jamie Eshelman).

## PROCEDURAL BACKGROUND

Hernandez-Mejia, along with nine others, was charged under an indictment that was unsealed on March 9, 2005.  See Redacted Indictment, filed March 9, 2005 (Doc. 1).  He was arrested a little over a week later, on March 17, 2005.  On October 12, 2005, a federal grand jury returned a ten-count Superseding Indictment.  See Superseding Indictment, filed October 12, 2005 (Doc. 153). The Superseding Indictment charged Hernandez-Mejia with conspiring to distribute heroin and cocaine, distributing cocaine, attempting to evade currency-reporting requirements, running an unlicensed money-transmitting operation, and using a telephone to facilitate the drug-distribution conspiracy. See id.  Hernandez-Mejia entered a plea of not guilty to all charges in the Superseding Indictment. See Clerk's Minutes of Arraignment, entered October 20, 2005 (Doc. 163).  Counts 2 and 3 of the Superseding Indictment -- attempting to evade currency-reporting requirements and running an unlicensed money-transmitting operation -- were dismissed before trial on the United States' motion. See Order, entered March 28, 2008 (Doc. 415).

Hernandez-Mejia was tried before a jury on the eight remaining counts in the Superseding Indictment.  After a four-day trial, the jury found Hernandez-Mejia guilty on all the counts submitted to the jury, save for Count Seven, which the jury had been instructed not to address.  See Verdict, entered April 10, 2008 (Doc. 450).[4] The Presentence Investigation Report ("PSR") was

---

[4] The Court refers to the redacted verdict that is public record and does not reveal the jury foreperson's signature.

disclosed on June 3, 2003.  The PSR calculated Hernandez-Mejia's base-offense level at 38 and his

criminal history at category III, yielding a sentencing range of 292 to 365 months.  See PSR ¶¶ 106,

111 at 32, 33.  A subsequent Addendum that the United States Probation Office ("USPO") prepared

stated that the Court could justifiably depart downward from criminal-history category from III to

II because a category of III over-represents Hernandez-Mejia's criminal history.  See Addendum

to the Presentence Investigation Report (disclosed June 17, 2008)("Addendum").  The Addendum

calculates a guideline range of 262-327 months based on an offense level of 38 and a criminal-

history category of II.  The Court held a sentencing hearing on June 25, 2008, but continued the

hearing to allow Edward Bustamante, Hernandez-Mejia's attorney, time to file a sentencing

memorandum.  See Transcript of June 25, 2008 Hearing at 4:17-23 (Court & Gomez).[5]  Mr.

Bustamante filed the sentencing memorandum in early July, 2008.

    Hernandez-Mejia makes three objections to the PSR.  His first objection is that the PSR

incorrectly increases his offense level 2 levels under U.S.S.G. § 2D1.1(b)(1).  He argues that, even

when the evidence at trial is considered in the light most favorable to the United States, the evidence

reveals that Hernandez-Mejia was a facilitator, not an enforcer, and that he never "brandished a

weapon or was responsible for the collection of funds."  Objections at 3.  He also contends that the

"overwhelming bulk of evidence indicated illicit activity from September of 2004 to December of

2004."  Id.  The handgun, however, was found on March 17, 2005, making it improbable,

Hernandez-Mejia maintains, that the gun was connected to activity that ended the year before.  See

id. at 3-4.

    Hernandez-Mejia's second objection is to the PSR's aggravating-role determination.  He

_____

    [5] The Court's citations to the transcripts of the hearings refer to the Court Reporter's original, unedited versions.  Any final transcripts may contain slightly different page and/or line numbers.

argues that only two cooperating witnesses testified to receiving drugs from Hernandez-Mejia, making the PSR's finding that he "was a leader or organizer of five or more persons" inappropriate. See Objections at 4.  He does not style his objection as being "a classic *Apprendi v. New Jersey*, 530 U.S. 466 (2000) violation," but rather contends that the PSR, "despite no finding by the jury, seeks to elevate the base offense level from 32 to 38." Objections at 4.  Such an increase, he notes, "nearly doubles the advisory sentence." Id.  He also contends that the evidence presented at trial does not show that the criminal activity in which he was involved was either sophisticated or extensive.  See id. at 4-5.  Rather, he maintains, it at most shows that he was "acting as a broker or supplier engaged in the transfer of illegal drugs for a three month time period." Id. at 5.

Hernandez-Mejia's third and final objection is to the PSR's computation of his criminal history.  He maintains that a criminal-history category of II overstates his past criminal conduct. He emphasizes that, despite being forty-eight-years old, he has only two prior convictions, which "occurred in 2000 and within a period of less than four months."  Objections at 5.  Those two convictions were misdemeanors under New Mexico law, he asserts, and occurred twenty-three years after he came to the United States.  He maintains that "[h]e is more similarly situated with persons in a category I criminal history." Id.  Ultimately, Hernandez-Mejia requests that the Court sentence him to 121 months of incarceration.  See id.

The United States devotes the majority of its response to outlining the evidence presented at trial, before turning to Hernandez-Mejia's specific objections.  The United States argues that the PSR correctly found that Hernandez-Mejia possessed a handgun under U.S.S.G. § 2D1.1(b)(1).  The United States maintains that the jury found him guilty of engaging in a drug-trafficking conspiracy that existed from October 1, 2004 until March 17, 2005.  See United States' Response to Defense's Objections and Sentencing Memorandum ¶ 1, at 8, filed July 23, 2008 (Doc. 478)("Response").  The

United States contends that on the day he was arrested -- March 17, 2005 -- officers found in his Los Lunas, New Mexico home "a handgun; a scale and the names, addresses and telephone numbers of his many co-defendants/co-conspirators." Id. ¶ 2. The same day that Hernandez-Mejia was arrested, the United States asserts, thirteen ounces of heroin were discovered at the place of business of his co-conspirator and co-defendant Falcon. See id. ¶ 3. Finally, the United States maintains that the money transfers made to Mexico list Hernandez-Mejia's address as the sender's address. See id. ¶ 4. Such facts, the United States contends, are sufficient to establish that Hernandez-Mejia possessed a handgun during the course of a conspiracy to traffic drugs.

The United States also argues that the PSR correctly applied the aggravating-role enhancement. According to the United States, the evidence at trial established that Hernandez-Mejia arranged and organized the participation of a number of individuals in smuggling heroin from Mexico to the United States, distributing the smuggled heroin within New Mexico, and transferring money to heroin suppliers in Mexico. See Response at 9. The United States names thirteen people that it states were involved in these activities. See id. The United States contends that this evidence sufficiently shows that Hernandez-Mejia was a criminal organizer. See id. at 8-9.

Finally, the United States argues that the PSR correctly calculated Hernandez-Mejia's criminal-history category. The United States notes that he committed his federal drug crimes "while under a criminal justice sentence that was imposed in the state of Arizona for a drug related felony." Response at 9. "A criminal history category I," the United States maintains, "is generally for those defendants with no criminal history." Id.

At the re-convened sentencing hearing, Mr. Bustamante conceded that the United States had established that Hernandez-Mejia had possessed a handgun, placing the burden on him to show that it was clearly improbable that the gun was connected with the drug-trafficking offense. See

Transcript of July 24, 2008 Hearing at 89:18-90:10 (Court & Bustamante)("Sentencing Tr."). Larry Gomez, attorney for the United States, conceded that a criminal-history category of III over-represented Hernandez-Mejia's criminal history, but stated that category II, as the USPO suggests, rather than the category I that Hernandez-Mejia supports, would be an accurate reflection of Hernandez-Mejia's criminal history. See id. at 103:15-22 (Court, Gomez).

The Court expressed concerns over whether a sentence within the guidelines would result in sentencing disparity compared with the sentences given to other defendants in this case. See id. at 104:21-105:7 (Court). Mr. Gomez stated that he believed the evidence showed that Hernandez-Mejia was the principal figure in the conspiracy, warranting a more severe sentence for him. See id. at 105:9-106:5 (Court & Gomez). Mr. Bustamante disagreed, saying that the "the only difference between Mr. Hernandez[-]Meji[a] and the other defendants is that he exercised his rights to a trial." Id. at 106:8-9 (Bustamante). Mr. Bustamante contended that Hernandez-Mejia's co-defendant Coroneles was the leader. See id. at 106:10-11. The Court then continued the hearing to take Hernandez-Mejia's objections under advisement.

## LAW REGARDING U.S.S.G. § 2D1.1(b)(1)

An offender sentenced under § 2D1.1 of the Sentencing Guidelines is subject to a 2-level enhancement to his base-offense level if "a dangerous weapon (including a firearm) was possessed" during the underlying drug-trafficking offense. U.S.S.G. § 2D1.1(b)(1). "The enhancement for weapon possession reflects the increased danger of violence when drug traffickers possess weapons." Id. § 2D1.1, cmt. n.3. The enhancement is expressed in the passive voice, and Application Note 3 to the Guidelines specifies that "[t]he adjustment should be applied if the weapon was present, unless it is clearly improbable that the weapon was connected with the offense." Id.

-11-

The United State Court of Appeals for the Tenth Circuit has held that, for the 2-level enhancement to apply, "[t]he government must show by a preponderance of the evidence that 'a temporal and spatial relation existed between the weapon, the drug trafficking activity, and the defendant. . . .'" United States v. Sallis, 533 F.3d 1218, 1225 (10th Cir. 2008)(quoting United States v. Pompey, 264 F.3d 1176, 1180 (10th Cir. 2001)(internal quotation omitted)). "If it does so, the burden shifts to the defendant, who must demonstrate that this connection is clearly improbable." United States v. Sallis, 533 F.3d at 1225 (quotation omitted). "'[T]he government need only show that the weapon was found in the same location where drugs or drug paraphernalia are stored," United States v. Zavalza-Rodriguez, 379 F.3d 1182, 1186-87 (10th Cir. 2004), or "that the weapon was located nearby the general location where drugs or drug paraphernalia are stored or where part of the transaction occurred," United States v. Flores, 149 F.3d 1272, 1280 (10th Cir. 1998)(quotation omitted).  See United States v. Hall, 473 F.3d 1295, 1312 (10th Cir. 2007)(upholding enhancement where "shotgun was found in a car sitting right outside [defendant's] residence and easily accessible through the top of the vehicle. . . . [and] other drug paraphernalia was found at the house, including scales with cocaine residue on them."); United States v. Humphrey, 208 F.3d 1190, 1211 (10th Cir. 2000) (upholding enhancement when gun found in trunk of defendant's Dodge, miles from the location of the defendant's arrest, and "no drugs were found in the trunk of the Dodge, [but] other items connected with the conspiracy were, including [] drug ledgers," and car was connected to an earlier drug-buying trip.)

"[I]n the case of jointly undertaken criminal activity . . . the district court must consider all reasonably foreseeable acts of others in furtherance of the criminal activity when applying sentencing enhancements."  United States v. Moreira, 2008 WL 4787157 at *3 (10th Cir. 2008)(citing U.S.S.G. § 1B1.3(a)(1)(B))(slip copy)(unpublished opinion). "Thus, a sentencing court

must 'attribute to a defendant weapons possessed by his co-defendants if the possession of weapons was known to the defendant or reasonably foreseeable by him.'" United States v. Moreira, 2008 WL 4787157 at *3 (quoting United States v. McFarlane, 933 F.2d 898, 899 (10th Cir. 1991)). The Tenth Circuit has "frequently noted that firearms are 'tools of the trade' for drug traffickers." United States v. Lizardo-Figueroa, 277 Fed.Appx. 778, 781 (10th Cir. 2008)(quoting United States v. Martinez, 938 F.2d 1078, 1083 (10th Cir. 1991)).

### LAW REGARDING U.S.S.G. § 3B1.1(a)
### AGGRAVATING-ROLE ENHANCEMENTS

Section 3B1.1 of the Sentencing Guidelines provides for enhancements to a defendant's offense level based on a defendant having played an aggravating role in the offense. Under § 3B1.1(a), "[i]f the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive, increase by **4** levels." Lesser enhancements are specified for defendants who are "managers or supervisors" rather than organizers or leaders, and for defendants involved in smaller-scale criminal conduct. Id. § 3B1.1(b)-(c). "A 'participant' is a person who is criminally responsible for the commission of the offense, but need not have been convicted." Id., cmt. n.1. "In assessing whether an organization is 'otherwise extensive,' all persons involved during the course of the entire offense are to be considered." Id., cmt. n.3. "The [Sentencing] Commission's intent is that this adjustment should increase with both the size of the organization and the degree of the defendant's responsibility." Id., backg'd.

Among the factors a sentencing court should consider when weighing an aggravating-role enhancement are:

[T]he exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of

control and authority exercised over others. There can, of course, be more than one person who qualifies as a leader or organizer of a criminal association or conspiracy.

Id., cmt. n.4. The Tenth Circuit has "elaborated that '[i]n considering these factors, the sentencing court should remain conscious of the fact that the gravamen of this enhancement is control, organization, and responsibility for the actions of other individuals because § 3B1.1(a) is an enhancement for organizers or leaders, not for important or essential figures.'" United States v. Sallis, 533 F.3d at 1223 (quoting United States v. Torres, 53 F.3d 1129, 1142 (10th Cir. 1995)). The Tenth Circuit, in the context of conspiracies to distribute illegal drugs, has also

> identified several factors which might indicate that a defendant exercised the requisite control over others, including that: other sellers worked for him, were recruited by him, or had their activities controlled by him; "he paid others for their efforts on behalf of the conspiracy;" "he restricted the people to whom other coconspirators could sell their drugs;" and "he controlled the manner of sales, set prices, or claimed the right to a larger share of proceeds." United States v. Anderson, 189 F.3d 1201, 1212 (10th Cir. 1999); see also United States v. Massey, 48 F.3d 1560, 1572 (10th Cir. 1995)(listing similar factors).

United States v. Sallis, 533 F.3d at 1223. "[A] role as a supplier of drugs to others, standing alone, is not enough," however, to justify a 4-level enhancement under § 3B1.1(a). United States v. Sallis, 533 F.3d at 1223-24 (quotation omitted).

While there is overlap between the activities that would make a defendant a leader and those that would make a defendant an organizer, the two are distinct. "Nothing in the Guidelines requires that an organizer must exercise some direction or control over underlings." United States v. Valdez-Arieta 127 F.3d 1267, 1271 (10th Cir. 1997). "As a result, a defendant may be punished as an organizer under § 3B1.1(c)[6] for devising a criminal scheme, providing the wherewithal to

---

[6] Section 3B1.1(c) applies to leaders, organizers, managers, or supervisors of organizations with less than five persons. The only relevant difference between an organizer under § 3B1.1(a) and an organizer under § 3B1.1(c), it seems, is the size of the organization.

accomplish the criminal objective, and coordinating and overseeing the implementation of the conspiracy even though the defendant may not have any hierarchical control over the other participants." United States v. Valdez-Arieta, 127 F.3d at 1272.

## ANALYSIS

Hernandez-Mejia raises three objections to the PSR. The Court concludes, however, that it should sustain only one of his objections. Hernandez-Mejia is unable to show that it was clearly improbable that the gun found in his house following his arrest was not related to his participation in an active conspiracy to distribute narcotics and so the Court will overrule his first objection. The evidence, however, does not demonstrate that he was a leader or organizer of the conspiracy, although it shows that he was a manager or supervisor, so the Court will sustain in part his second objection. Finally, he cannot demonstrate why a criminal-history category of II overstates his criminal history given his two recent convictions, so the Court will overrule his third objection.

## I.    HERNANDEZ-MEJIA HAS NOT SHOWN THAT IT WAS CLEARLY IMPROBABLE THAT HIS POSSESSION OF A FIREARM WAS CONNECTED TO HIS CONSPIRING TO DISTRIBUTE DRUGS.

Hernandez-Mejia challenges the PSR's increasing his offense level under U.S.S.G. § 2D1.1(b)(1) by 2 levels because he had a gun in his house. Hernandez-Mejia was found guilty of conspiring to distribute heroin and cocaine, and of distributing cocaine. When he was arrested, a loaded handgun was found on the floor of a bedroom in his house. The evidence presented at Hernandez-Mejia's trial demonstrated that the handgun was possessed during the course of the drug-trafficking conspiracy. Hernandez-Mejia has not made a sufficient showing that it was clearly improbable that his possession of the gun was unrelated to his conspiring to distribute heroin and cocaine.

Once the United States demonstrates that "a temporal and spatial relation existed between

the weapon, the drug trafficking activity, and the defendant. . . . the burden shifts to the defendant, who must demonstrate that this connection is clearly improbable." United States v. Sallis, 533 F.3d at 1225 (quotations omitted). Hernandez-Mejia concedes that the United States has met its initial burden of establishing a nexus, requiring him to affirmatively show that such a link is clearly improbable. See Sentencing Tr. at 89:18-90:10 (Court & Bustamante). Hernandez-Mejia is unable to carry that burden and overcome the evidence introduced at trial establishing the connection.

The gun was found in Hernandez-Mejia's house during a time period in which he was engaged in a narcotics conspiracy. Furthermore, the house in which the gun was discovered has several connections to that drug conspiracy. These connections can establish that the gun was possessed during the course of the conspiracy. See, e.g., United States v. Flores, 149 F.3d at 1280 (holding that enhancement was proper where "the weapon was located nearby the general location where drugs or drug paraphernalia are stored or where part of the transaction occurred")(quotation omitted). The federal agents who searched Hernandez-Mejia's house found not only the gun, but also an electronic scale and papers with the contact information of his co-conspirators. See III Trial Tr. at 220:22-25, 219:18-22 (Gomez & Chavez). This evidence tends to link the gun to drug-trafficking. See United States v. Hall, 473 F.3d at 1312 (upholding enhancement where "shotgun was found in a car sitting right outside [defendant's] residence and easily accessible through the top of the vehicle. . . . [and] other drug paraphernalia was found at the house, including scales with cocaine residue on them"); United States v. Humphrey, 208 F.3d at 1211 (finding that drug ledgers and gun together in trunk of car supported enhancement). Additionally, the trial evidence indicated that the house was the center of the financial activity underpinning the conspiracy. Montoya was arrested with $33,000.00 in cash containing traces of narcotics after leaving Hernandez-Mejia's home. See I Trial Tr. at 30:8-32:24, 35:7-24 & 36:14-37:15 (Martinez & Mata). Hernandez-Mejia's

-16-

address was given for the numerous transmittals of money to Mexico.  See IV Trial Tr. at 52:6-56:5, 63:17-73:13 (Martinez & Michaels).

At the time he was arrested, Hernandez-Mejia was also engaged in an ongoing conspiracy. As a result of the conspiracy, in addition to the evidence directly linking his house and the gun inside with drug trafficking, the actions of his co-conspirators can be attributed to him so long as they are "reasonably foreseeable acts . . . in furtherance of the" conspiracy.  United States v. Moreira, 2008 WL 4787157 at *3 (citing U.S.S.G. § 1B1.3(a)(1)(B)).  "Firearms are 'tools of the trade' for drug traffickers," so it is reasonable to impute co-conspirators' possession of guns to Hernandez-Mejia.  See United States v. Lizardo-Figueroa, 277 Fed.Appx. at 781 (quoting United States v. Martinez, 938 F.2d at 1083).  It is also reasonable to impute co-conspirator's possession of drugs to Hernandez-Mejia, as the object of the conspiracy was to sell drugs.

Hernandez-Mejia and Falcon were both arrested the same day.  The day of the arrests, March 17, 2005,  a search of Falcon's residence turned up approximately $8400.00 in cash hidden under a drawer in a dresser and a firearm under a sofa the living room.  See III Trial Tr. at 192:6-193:20 (Gomez & Burkey).  A search of Falcon's business, Durango Electronics, also on March 17, 2005, revealed two packages of several brown balls that agents suspected were drugs in a rear storage room, see id. at 195:17-202:14 (Gomez & Hale), and the balls were later identified as heroin, see IV Trial Tr. at 16:13-17:4 (Gomez & Eshelman).  This evidence can all be imputed to Hernandez-Mejia, and further strengthens the ties between his gun and the conspiracy.

Given this evidence, Hernandez-Mejia's arguments are unable to demonstrate clear improbability.  Hernandez-Mejia mainly attacks the United States' evidence as insufficient; he does not raise any affirmative arguments that the gun was for a purpose unrelated to drug trafficking.  His first contention is that the evidence at trial indicated that the illicit activity ended in December 2004,

making it "improbable that the handgun found on March 17, 2005 was connected to drug offenses occurring from September, 2004 to December 2004." Objections at 3-4. This argument is unavailing, because the jury was instructed that, for it to find Hernandez-Mejia guilty of conspiracy, the jury must conclude that the conspiracy lasted from on or about October 1, 2003 to on or about March 17, 2005. See IV Trial Tr. at 157:18-24 (Court). Moreover, because a search of Falcon's business on March 17, 2005, revealed thirteen ounces of heroin, there is evidence that the conspiracy was ongoing, even if there were "multiple complications in the delivery and transfer of funds to Mexico." Objections at 3. Hernandez-Mejia has not demonstrated that the conspiracy ended before the string of arrests on March 17, 2008, or that he withdrew from the conspiracy. It is therefore appropriate to conclude that Hernandez-Mejia was a member of an active drug-trafficking conspiracy at the time of his arrest on March 17, 2005.

The second reason Hernandez-Mejia advances for finding § 2D1.1(b)(1) inapplicable is that he was "not an enforcer," and never "brandished a weapon." Objections at 3. This reasoning is unpersuasive given § 2D1.1(b)(1)'s standard. The § 2D1.1(b)(1) enhancement does not require a defendant to have used a dangerous weapon. The enhancement applies if "a dangerous weapon (including a firearm) was possessed" during the offense. U.S.S.G. § 2D1.1(b)(1) (emphasis added). See id. § 2D1.1, cmt. n. 3 ("The adjustment should be applied if the weapon was present, unless it is clearly improbable that the weapon was connected with the offense."). The Supreme Court of the United States has noted that the standard for § 2D1.1 requires only possession rather than use, see Bailey v. United States, 516 U.S. 137, 150 (1995), and the Tenth Circuit has repeatedly upheld applying the enhancement where a gun was merely found in a defendant's possession, see, e.g., United States v. Hall, 473 F.3d at 1312 (upholding enhancement where shotgun found in car outside house); United States v. Flores, 149 F.3d at 1280 (upholding enhancement where shotgun found near

drugs).  A lack of evidence that Hernandez-Mejia used the gun or acted as an enforcer for the conspiracy does not eliminate "the increased danger of violence when drug traffickers possess weapons" that the enhancement is meant to address.  U.S.S.G. § 2D1.1, cmt. n.3.

The characteristics of the gun itself also reduces the likelihood that it was not possessed in connection with Hernandez-Mejia's drug activities.  The firearm was loaded and was a handgun. Compare id. (giving example of clear improbability as defendant's having, in his residence, "an unloaded hunting rifle in the closet").  Because Hernandez-Mejia has failed to prove that it was clearly improbable that his possession of a loaded handgun was unrelated to his participation in a drug-trafficking conspiracy, the PSR correctly assessed a 2-level enhancement pursuant to § 2D1.1(b)(1).

## II. HERNANDEZ-MEJIA WAS NOT AN ORGANIZER OR LEADER OF A DRUG CONSPIRACY INVOLVING MORE THAN FIVE PERSONS.

Hernandez-Mejia objects to the PSR's determination that he "was a leader or organizer of five or more persons," entailing a 4-level enhancement pursuant to U.S.S.G. § 3B1.1(a).  Objections at 4.  He contends that the evidence at trial shows him to have been a "broker or supplier" of illegal drugs, but not a leader.  Id. at 5.  The Court partially agrees.  Hernandez-Mejia was part of a conspiracy involving more than five people, but the evidence at trial does not demonstrate that his role within that conspiracy was one of a leader or organizer under the case law.  The evidence demonstrates, however, that he was a manager or supervisor, and he is thus subject to the 3-level enhancement under § 3B1.1(b).

### A. THE CONSPIRACY INVOLVED MORE THAN FIVE PERSONS.

The 4-level enhancement under § 3B1.1(a) applies if two conditions are met: (i) the criminal activity must have involved "five or more participants or [been] otherwise extensive"; and (ii) the

defendant must have been an organizer or leader of that activity.  U.S.S.G. § 3B1.1(a).  When counting the number of participants in a criminal activity, the court must consider only those persons "criminally responsible for the commission of the offense," but they "need not have been convicted."  Id. § 3B1.1, cmt. n.1.  The evidence presented at trial demonstrated that numerous individuals were involved in the conspiracy and were criminally responsible for their involvement. For example, Hernandez-Mejia was supplying heroin to Coroneles, see I Trial Tr. at 231:7-11 (Martinez & Mata), and cocaine to Delgado and Rael, see II Trial Tr. at 151:1-22 (Martinez & Delgado); III Trial Tr. at 74:13-75:3 (Martinez & Rael).  Corral acted as the intermediary who introduced Delgado to Hernandez-Mejia.  See II Trial Tr. at 138:9-139:25 (Martinez & Delgado). That evidence alone is enough to establish the existence of drug activity involving more than five people.  The evidence presented at trial, however, demonstrated the involvement of several others. Moreover, many of the co-conspirators named in the Indictment or the Superseding Indictment pleaded guilty to conspiracy.  See, e.g., Plea Agreement ¶ 3, at 2, filed July 19, 2005 (Doc. 117)(Falcon agreeing to plead guilty to conspiracy); Plea Agreement ¶ 3, at 2, filed October 28, 2005 (Doc. 183)(Adrian Palacios agreeing to plead guilty to conspiracy); Plea Agreement ¶ 3, at 2, filed February 15, 2006 (Doc. 255)(Delgado agreeing to plead guilty to conspiracy).  The record shows that there is a preponderance of the evidence demonstrating that Hernandez-Mejia participated in criminal activity involving more than five people.  The crux of the issue is thus whether his involvement amounted to being a leader or organizer.

### B.   HERNANDEZ-MEJIA WAS NOT A LEADER OR ORGANIZER.

Determining whether someone is a leader or organizer involves a multi-factored test.  The factors the Sentencing Guidelines specifically mention include:

[T]he exercise of decision making authority, the nature of participation in the

> commission of the offense, the recruitment of accomplices, the claimed right to a
> larger share of the fruits of the crime, the degree of participation in planning or
> organizing the offense, the nature and scope of the illegal activity, and the degree of
> control and authority exercised over others.

U.S.S.G. § 3B1.1, cmt. n. 4.  The Tenth Circuit has also identified a number of factors that are

particularly appropriate for drug-conspiracy cases.  Under the Tenth Circuit's case law, to determine

whether a defendant exercised the appropriate level of control, a court should look at whether

> other sellers worked for him, were recruited by him, or had their activities controlled
> by him; he paid others for their efforts on behalf of the conspiracy; he restricted the
> people to whom other coconspirators could sell their drugs; and he controlled the
> manner of sales, set prices, or claimed the right to a larger share of proceeds.

United States v. Sallis, 533 F.3d at 1223 (quotations omitted).

Applying the factors mentioned in the Sentencing Guidelines, the Court determines that the

factors weigh against finding that Hernandez-Mejia was a leader or organizer.  Many features about

the conspiracy and particularly about its decision-making structure are unclear.  It is not clear for

example, whether Hernandez-Mejia exercised much control over those to whom he sold drugs.

Many of the drug transactions described at trial and in the PSR involve various people calling up

Hernandez-Mejia to buy drugs.  See, e.g., PSR ¶¶ 36-37, at 9; 47, at 15.  Hernandez-Mejia's role

appeared to be that of a wholesale supplier.  His conduct generally seemed reactive, rather than

proactive.  The evidence does not show extensive planning or control over others; it does not show

what cut of the profits Hernandez-Mejia claimed.  While arguably he recruited Delgado, Corral

brought Delgado to him, and there is no indication that he recruited anyone else to the conspiracy.

See II Trial Tr. at 138:9-139:25 (Martinez & Delgado).

Applying the factors the Tenth Circuit has singled out for drug conspiracies leads to a similar

result.  Again, Hernandez-Mejia does not seem to have played a significant role in directing the

activities of others, nor in recruiting anyone other than Delgado.  With the exception of Delgado,

-21-

Hernandez-Mejia did not set prices for the sale of drugs, there is no indication that he limited to whom those buying from him could sell, and, except for the "gifts" to Delgado, no evidence that he paid others for their roles in the conspiracy.  Again, the picture that emerges is that of the supplier, or the wholesaler, and not of someone directing operations.

The factors mentioned in the Guidelines and elucidated by the Tenth Circuit weigh against finding that Hernandez-Mejia deserves a 4-level enhancement.  While there are many indications of his importance to the endeavors of the conspiracy, "§ 3B1.1(a) is an enhancement for organizers or leaders, not for important or essential figures."  United States v. Sallis, 533 F.3d at 1223 (quotation omitted).  Moreover, the Tenth Circuit has admonished that "a role as a supplier of drugs to others, standing alone, is not enough" to justify a 4-level enhancement under § 3B1.1(a).  See United States v. Sallis, 533 F.3d at 1223-24 (quotation omitted).  A 4-level enhancement is not a trivial adjustment.  The evidence here is not sufficient to show that it should be applied.

While the PSR does not state whether it considers Hernandez-Mejia to be a leader, an organizer, or both, see PSR ¶ 102, at 31, in defending the enhancement, the United States seeks to cast Hernandez-Mejia more as an organizer than an a leader, see Response at 8 (referring to Hernandez-Mejia as an "organizer").  The United States' emphasis on organization tends to strengthen the case for applying a 4-level enhancement, but not enough to warrant imposing the enhancement.  Although Hernandez-Mejia's role was important to the success of the conspiracy, he does not seem to have operated as an organizer in a significant way.  Rather, his activities involved providing drugs to various individuals, but not bringing them together into anything more coherent than a group of individuals who shared a common source of supply.

The case upon which the United States relies, United States v. Valdez-Arieta, notes that "[n]othing in the Guidelines requires that an organizer must exercise some direction or control over

underlings." 127 F.3d at 1271.  "As a result, a defendant may be punished as an organizer under §
3B1.1(c) for devising a criminal scheme, providing the wherewithal to accomplish the criminal
objective, and coordinating and overseeing the implementation of the conspiracy even though the
defendant may not have any hierarchical control over the other participants."  United States v.
Valdez-Arieta, 127 F.3d at 1272.  United States v. Valdez-Arieta also notes, however, that several
of the factors listed in Application Note 4 are relevant to determining whether someone is an
organizer.  United States v. Valdez-Arieta, 127 F.3d at 1271.

        The factors the Guidelines identify do not support an organizer enhancement anymore than
they support a leader enhancement.  There is only one instance where Hernandez-Mejia arguably
recruited someone to the conspiracy.  While Hernandez-Mejia undoubtedly played a central role in
the conspiracy, particularly in paying his suppliers in Mexico, and selling drugs to or through
various co-conspirators, the evidence does not reveal that he coordinated the activities of the
conspiracy in any substantial way.

        The United States focuses on three particular classes of activity in which the conspirators
were engaged as supporting an organizer enhancement: "1) The smuggling of large amounts of
heroin from the Republic of Mexico to the United States; 2) The distribution of those large amounts
of heroin in New Mexico; 3) International money transfers totaling a large amount of money to
sources of supply of the heroin in the Republic of Mexico."  Response at 9. While Hernandez-Mejia
had some role in all three of these areas, the available information about his activities does not
support an organizer enhancement.

        First, it is not clear what role Hernandez-Mejia played in bringing heroin into the United
States.  Neither the evidence at trial nor the information in the PSR explains how Hernandez-Mejia
received heroin from his suppliers in Mexico.  It is possible that the suppliers arranged for the

transportation of heroin across the border and Hernandez-Mejia only received the heroin. There is nothing indicating he had an organizational role in any smuggling.

Second, while he was the main supplier to a variety of persons in New Mexico, the evidence does not demonstrate that he played a significant role in orchestrating activities. The evidence of his role in recruiting participants is limited. There is no evidence how the conspiracy originated or who devised the manner in which it would operate. Hernandez-Mejia seems largely to have purchased drugs from Mexico in bulk and then sold them upon request to various individuals. The evidence does not demonstrate that he had a significant role in setting resale prices of the drugs, or in providing instruction or guidance to those to whom he was selling. Compare United States v. Valdez-Arieta, 127 F.3d at 1272 (noting that relevant activities for an organizer include "devising a criminal scheme . . . coordinating and overseeing the implementation of the conspiracy").

Third, while Hernandez-Mejia was the main figure in sending money to Mexico to pay for the heroin being smuggled into the United States, it is not clear how much of an organizational role he played in this aspect of the conspiracy. The evidence points to Hernandez-Mejia principally acting alone to wire money back to Mexico for the drugs he was buying, rather than coordinating the activities of others or arranging financial transactions on behalf of others. There are only two incidents that the United States mentions that could demonstrate an organizational role in the transfers: (i) Hernandez-Mejia's apparently sending Montoya off with $33,000.00 in cash, see Response ¶ 2, at 3; and (ii) his call with Anaya about sending money to Mexico, see id. ¶ 6, at 6. The import of the second incident is unclear, leaving only one incident to support an organizational role in the money transfers. In sum, while several of the factors indicate that Hernandez-Mejia was an organizer, the Court concludes that the overall picture is unclear and that many of the features that would normally indicate an organizational role have not been demonstrated by a preponderance

-24-

of the evidence.

     **C.**     **HERNANDEZ-MEJIA WAS A MANAGER OR SUPERVISOR.**

     While the available information about Hernandez-Mejia's conduct does not support a 4-level enhancement for being an organizer or leader, the evidence supports a lesser, 3-level enhancement under § 3B1.1(b) of the Guidelines for being a "manager or supervisor" involved in criminal activity with five or more participants.  While requiring indicia of control similar to that a leader must have, being a supervisor or manager is a lesser standard, and a defendant "need only manage or supervise one participant" in the conspiracy.  United States v. Gonzalez Edeza, 359 F.3d 1246, 1248 (10th Cir. 2004).  Although the evidence is not strong enough to label Hernandez-Mejia a leader, the record demonstrates that he was a manager of at least Delgado.  Hernandez-Mejia's relationship with Delgado demonstrates several of the factors indicative of control.  Along with Corral, Hernandez-Mejia recruited Delgado into the conspiracy.  See II Trial Tr. at 138:9-139:25 (Martinez & Delgado).  Delgado sold drugs for Hernandez-Mejia at prices Hernandez-Mejia set, in return for "gifts" of cocaine as payment.  Id. at 151:1-22.  This relationship is that of a supervisor and subordinate.  Because the overall criminal activity involved more than five persons, the 3-level enhancement for being a supervisor or manager would apply.

**III.**    **A CRIMINAL-HISTORY CATEGORY OF II ACCURATELY REFLECTS HERNANDEZ-MEJIA'S CRIMINAL BACKGROUND.**

     Hernandez-Mejia objects to the PSR, which sets his criminal history at category III, and to the Addendum, which suggested lowering his criminal-history category from III to II.  Hernandez-Mejia maintains that his category should be further reduced to I.  He argues that he is forty-eight-years old and lived in the United States for twenty-three years before being convicted of two minor

offenses in the span of four months.[7]  <u>See</u> Objections at 5.  This situation makes him similarly situated, he asserts, to "persons with a category I criminal history."  <u>Id.</u>  Although not formally presented as such, the Court will treat Hernandez-Mejia's objection as a motion for downward departure.  Hernandez-Mejia does not argue that his criminal history was incorrectly calculated, but that it is over-represented by a category of II.  His objection is therefore essentially a motion for a downward departure pursuant to § 4A1.3(b)(1) of the Guidelines, based on the inadequacy of his criminal-history category.[8]  While Hernandez-Mejia's criminal history is not extensive, he has not shown that there is a sufficient disparity between him and other typical criminal-history category II defendants to warrant a reduction in his criminal-history category.

A downward departure because a defendant's criminal-history category overstates his criminal history is appropriate if the category the defendant is in "substantially over-represents the seriousness of the defendant's criminal history or the likelihood that the defendant will commit other crimes."  U.S.S.G. § 4A1.3(b)(1), p.s.  Such a situation might arise, the Guidelines suggest, where "the defendant had two minor misdemeanor convictions close to ten years prior to the instant offense and no other evidence of prior criminal behavior in the intervening period."  <u>Id.</u> § 4A1.3, backg'd.  Hernandez-Mejia's situation does not resemble such circumstances.

The outer boundary for assessing criminal-history points for the previous crimes of which Hernandez-Mejia was convicted is ten years.  <u>See id.</u> § 4A1.2(e)(2).  His convictions are within this ten-year limitations period.  They are, in fact, within five years of his arrest on the federal drug

_____

[7] Hernandez-Mejia has turned forty-nine since the Objections were filed.

[8] Hernandez-Mejia's objection might also be characterized as a request for a variance from the Sentencing Guidelines.  The Court will address the appropriateness of any request for a variance at the continuance of the sentencing hearing.

offense, and within an even shorter time of the beginning of the conspiracy.  See PSR ¶¶ 108-109, at 32-33 (describing arrest on November 26, 2000).  Hernandez-Mejia was arrested in Phoenix, Arizona on November 26, 2000, and charged and convicted of assault, criminal damage, and possession of drug paraphernalia.  See id.  He was also charged with possession of cocaine, but that charge was dismissed.  See id. ¶ 109, at 33.  Given the recency of these convictions, Hernandez-Mejia is not in the situation of a person pulled into a higher category based on the misfortune of having convictions that barely fall within the limitations period.

Additionally, although Hernandez-Mejia emphasizes that the crimes of which he was convicted are misdemeanors under New Mexico law, they are serious offenses.  His convictions include a violent crime and a drug offense.  While criminal-history category I is not exclusively for those with no criminal history, the majority of those falling within that category probably do not have multiple convictions that include both a violent offense and a drug offense.

Hernandez-Mejia also notes that he has had no convictions for twenty-three years after coming to the United States and that he is now forty-eight.  His record before the convictions in 2000 is not, however, unblemished.  He was arrested in 1987 on various drug charges, and again in 1988 on a drug charge and for failure to appear.  See PSR ¶¶ 112-13, at 34.  Although never convicted of these charges, they do caution against considering Hernandez-Mejia's convictions to be recent aberrations.  Moreover, although he is forty-eight and has had no convictions until 2000, that all his convictions are recent is troubling.  Hernandez-Mejia may have avoided acquiring a criminal history in his first twenty-three years in the United States, but his recent past tells a different story.  His age is also not particularly mitigating given that it has not stopped him from playing a significant role in a major drug-distribution conspiracy.  Taken as a whole, the Court cannot conclude that a criminal-history category of II "substantially over-represents the seriousness

of" Hernandez-Mejia's criminal history "or the likelihood that" he will commit crimes in the future. U.S.S.G. § 4A1.3(b)(1), p.s.

The final result of the Court's rulings is that Hernandez-Mejia's criminal-history category remains at II, but that his offense level should be lowered 1 level, to an adjusted level of 37.  The advisory guidelines range for Hernandez-Mejia is therefore 235 to 293 months.

**IT IS ORDERED** that the Defendant's Objections to Presentence Report and Guideline Calculation are sustained in part and overruled in part.  The Court overrules the objection to the application of U.S.S.G. § 2D1.1(b)(1).  The Court will treat the Defendant's objection to his criminal-history category as a motion for downward departure and deny the motion.  The Court will sustain in part the objection to the application of U.S.S.G. § 3B1.1(a), but will apply § 3B1.1(b).

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Gregory J. Fouratt
  United States Attorney
Larry Gomez
Damon P. Martinez
  Assistant United States Attorneys
Albuquerque, New Mexico

   *Attorneys for the Plaintiff*

Edward O. Bustamante
Albuquerque, New Mexico

   *Attorney for the Defendant*